438 S.E.2d 801

Marion V. McFILLAN, Jr., Plaintiff Below, Appellant,

v.

BERKELEY COUNTY PLANNING COMMISSION, Defendant Below, Appellee.

No. 21667.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 21, 1993.

Decided Dec. 13, 1993.

**460**

Michael L. Scales, Greenberg & Scales, Martinsburg, for appellant.

Janet L. Scalia, Asst. Pros. Atty., for Berkeley County, Martinsburg, for appellee.

MILLER, Justice:

Marion V. McFillan, Jr., the appellant and plaintiff below, appeals a final order of the Circuit Court of Berkeley County, dated December 3, 1992, denying his request for an exemption from complying with the Berkeley County Subdivision Regulations (Regulations). On appeal, the plaintiff argues, under several legal theories, that he should be allowed to expand his mobile home park notwithstanding the Regulations. We have reviewed the record and find the plaintiff's arguments to be without merit; accordingly, we affirm the trial court's final order.

## I.

On January 21, 1975, the Berkeley County Court adopted the Regulations which relate to unincorporated land in Berkeley County. The Regulations were part of a comprehensive plan[1] the Berkeley County Planning Commission (Commission) passed pursuant to W.Va.Code, 8–24–16 (1969).[2] Article IX of the Regulations prescribes a wide variety of minimum standards for mobile home parks and developments. For example, the Regulations require all mobile home parks to be at least five acres and each individual mobile home lot to contain at least 5000 square feet.

On August 14, 1980, the plaintiff purchased from Howard T. and Mary Margaret Stolipher a mobile home park that had been in existence when the Regulations were passed. After purchasing the property, the plaintiff asked the Planning Director of the Commission, Christine L. DeCamp, whether this mobile home park was required to comply with the provisions of the Regulations.

In correspondence dated December 12, 1980, Ms. DeCamp informed the plaintiff that the Stolipher mobile home park was exempt from the Regulations. However, Ms. De-

---

1. W.Va.Code, 8–24–3(b) (1988), states: " 'Comprehensive plan' shall mean a complete comprehensive plan or any of its parts such as a comprehensive plan of land use and zoning, of thoroughfares, of sanitation, of recreation and other related matters, and including such ordinance or ordinances as may be deemed necessary to implement such complete comprehensive plan or parts thereof by legislative approval and provision for such rules or regulations as are deemed necessary and their enforcement[.]"

2. Under W.Va.Code 8–24–16 (1969), the Commission "shall make and recommend for adoption to the governing body of the municipality or to the county court [county commission], as the case may be, a comprehensive plan for the physical development of the territory within its jurisdiction."

Camp explained that this decision applied only to the Stolipher mobile home park and that the Commission's staff would determine on a case-by-case basis whether such an exemption would be granted to other preexisting mobile home parks.[3]

Approximately one year later, the plaintiff purchased the Rocky Glen Mobile Home Community (Rocky Glen), also located in Berkeley County. Instead of requesting an opinion from the Commission on whether this mobile home park was subject to the provisions of the Regulations, the plaintiff simply assumed that the property was exempt and proceeded to expand the park without attempting to meet the standards outlined in Article IX of the Regulations. From 1981 to May of 1992, the plaintiff increased the number of mobile home lots in Rocky Glen from 25 to 245. None of the new lots conformed with the Regulations.

On October 29, 1991, William Teach, an interim director for the Commission, wrote the plaintiff and explained that any further expansion of Rocky Glen would require the Commission's review and approval.[4] After not hearing from the plaintiff for over a year,

Mr. Teach sent him a follow-up letter once again reminding him that he would have to obtain the Commission's approval before expanding the number of mobile home lots at Rocky Glen.[5] Finally, on April 13, 1992, Mr. McFillan wrote back to the director stating that he had been led to believe that any mobile home park that was in existence at the time the Regulations were passed was not subject to their provisions. In a letter dated April 27, 1992, Mr. Teach informed Mr. McFillan that he must secure the Commission's approval before proceeding any further on his plan to expand Rocky Glen.

On further inquiry, the plaintiff received from the Commission a copy of a document entitled "DIRECTIVE TO ENFORCEMENT OFFICER AND LEGAL COUNSEL," which was dated September 11, 1989. This directive informed the necessary personnel that any future expansion of a mobile home park, regardless of whether the business existed before the Regulations were passed, was subject to the Regulations and would, therefore, have to conform with all their provisions.[6]

---

**3.** The Stolipher mobile home park is not involved in this case. Our reference to it is only to explain how the plaintiff obtained a copy of Ms. DeCamp's memorandum which provided an exemption for the Stolipher mobile home park. The memorandum, in pertinent part, states:

> "*Staff Recommendations:* The staff recommends, based on the facts that this mobile home park was in existence prior to the adoption of the Subdivision Regulations, that there is adequate land area for expansion, and that the owner is complying with all Health Department requirements, that this mobile home park be exempt from the Berkeley County Subdivision Regulations.
> "The staff also recommends that the Planning Commission direct the staff to determine, in future cases of this type, whether or not a mobile home park shall be exempt from the Subdivision Regulations. In the event that the staff is not able to make such a determination, the individual case in question will be presented to the Planning Commission."

**4.** Mr. Teach's October 29, 1991 letter states in full:

> "Dear Mr. McFillan:
> "It has come to our attention that you are planning an expansion of your mobile home park at Rocky Glen Mobile Home Park. Please be advised that any expansion of the mobile home park beyond what existed in 1975

will require Planning Commission review and approval. Should you have any questions, please feel free to contact the staff."

**5.** In his correspondence dated March 30, 1992, Mr. Teach explained:

> "Dear Mr. McFillan:
> "This is just a reminder to you that if you plan to expand the Rocky Glen Mobile Home Park it will be necessary to obtain Planning Commission approval prior to such expansion. This is a follow-up letter to our letter of October 29, 1991. Also, on October 31, 1991, you called and left a message for me to call you. I called later that day and was told you would be going into the hospital, but would call back as soon as you got out and was able to get back in touch with our office. Since we have not heard from you we thought it best to give you a friendly reminder before you expended money on the expansion."

**6.** The directive stated:

> "We, the undersigned members of the Berkeley County Planning Commission, hereby authorize the Enforcement Officer and/or Legal Counsel to inform any persons or businesses which are in receipt of response from the Berkeley County Planning Commission indicating that their current operations are 'grandfathered' to, by letter or otherwise, inform said

On May 18, 1992, the plaintiff appeared before the Commission. At that meeting, the plaintiff informed those attending that there were 245 mobile home lots at Rocky Glen, 230 of which were already occupied. Mr. McFillan also stated that he had preliminary plans to expand the trailer park by an additional 63 units. When the Commission asked the plaintiff to provide it with these plans, he advised that he was not looking for their approval. Thereafter, the Commission voted to require the plaintiff to comply with the Regulations for any future expansion.

Subsequently, the plaintiff filed a petition for certiorari in the Circuit Court of Berkeley County requesting a review of the Commission's decision. In an order dated December 3, 1992, the circuit court upheld the Commission's decision.

## II.

The Regulations at issue in this case are subdivision regulations enacted pursuant to W.Va.Code, 8–24–28 through –35. Among these statutory provisions is the following requirement contained in W.Va.Code, 8–24–33 (1969):

"*After a comprehensive plan and an ordinance containing provisions for subdivision control and the approval of plats and replats have been adopted and a certified copy of the ordinance has been filed with the clerk of the county court [county commission] as aforesaid, the filing and recording of a plat involving the subdivision of lands covered by such comprehensive plan and ordinance shall be without legal effect unless approved by the commission[.]*" (Emphasis added).

The subdivision control provisions are part of a larger statutory scheme dealing with planning, zoning, and development of a comprehensive plan. *See* W.Va.Code, 8–24–1, *et seq.* Initially, under W.Va.Code, 8–24–1 (1969), the "governing body of every municipality and the county court [county commission] of every county may by ordinance create a planning commission[.]" The creation and composition of municipal and county planning commissions are outlined in W.Va. Code, 8–24–5 (1986), and W.Va.Code, 8–24–6 (1986). Under W.Va.Code, 8–24–16 (1969), a planning commission "shall make and recommend for adoption to the governing body ... a comprehensive plan for the physical development of the territory within its jurisdiction."

It is clear from the comprehensive nature of the provisions in W.Va.Code, 8–24–1, *et seq.*, that the historic distinction we have made between zoning and planning [7] has been largely obliterated because both concepts are now incorporated into a comprehensive plan. W.Va.Code, 8–24–39 (1988), gives broad zoning authority power over a variety of different subjects.[8] Moreover, a

---

persons or businesses that such 'grandfathering' will not apply to subsequent expansion or modification of their current operation or development made after receipt of such 'grandfathering' notice.

"It is the position of the Berkeley County Planning Commission that those who have relied on such 'grandfather' notices should not be penalized for that reliance but neither should they be permitted to expand operation without compliance with our applicable ordinances."

**7.** In Syllabus Point 1 of *Kaufman v. Planning & Zoning Commission*, 171 W.Va. 174, 298 S.E.2d 148 (1982), we stated: "Zoning is concerned with whether a certain area of a community may be used for a particular purpose while planning involves how the use is undertaken."

**8.** Under W.Va.Code, 8–24–39, designated as "Zoning authority generally," the governing body of a municipality or a county commission is given the following powers:

"(a) To classify, regulate and limit the height, area, bulk and use of buildings hereafter to be erected;

"(b) To regulate the height, area, bulk, exterior architectural features and use of buildings hereafter to be erected within designated historic districts;

"(c) To regulate the alteration of exterior architectural features of buildings within historic districts and to regulate the alteration of historic landmarks and sites;

"(d) To regulate and determine the area of front, rear and side yards, courts and other open spaces about such buildings;

"(e) To regulate and determine the use and intensity of use of land and lot areas;

"(f) To classify, regulate and restrict the location of trades, callings, industries, commercial enterprises and the location of buildings designed for specified uses;

"(g) To regulate and control, or prohibit in certain areas, junk yards, salvage yards, used parts yards, dumps or automobile or appliance

comprehensive subdivision plan under W.Va. Code, 8–24–28,[9] may contain both zoning and building restrictions through its use of the term "comprehensive plan." [10]

Thus, we believe that under W.Va.Code, 8–24–1, et seq., the governing body of a municipality or the county commission may create a planning commission to develop a comprehensive plan for zoning, building restrictions, and subdivision regulations. Thereafter, the governing body or the county commission may adopt all or parts of such a comprehensive plan.

### III.

In this case, the plaintiff does not argue that the Regulations violated any provisions of W.Va.Code, 8–24–1, et seq. Rather, his principal argument is that because Rocky Glen existed as a mobile home park prior to the adoption of the Regulations, a valid nonconforming use existed.

We have recognized the concept of a nonconforming use, which occurs when land is lawfully used prior to the adoption of an ordinance that restricts its use. Such a nonconforming use generally may be continued until it is abandoned, as we stated in note 1 of *Longwell v. Hodge,* 171 W.Va. 45, 47, 297 S.E.2d 820, 822 (1982):

> "A non-conforming use is a use which, although it does not conform with existing zoning regulations, existed lawfully prior to the enactment of the zoning regulations.

These uses are permitted to continue, although technically in violation of the current zoning regulations, until they are abandoned. An exception of this kind is commonly referred to as a 'grandfather' exception."

*See also H.R.D.E., Inc. v. Zoning Officer of the City of Romney,* 189 W.Va. 283, 430 S.E.2d 341 (1993). *See generally* 83 Am. Jur.2d *Zoning & Planning* § 624 at 520 (1992).

The Regulations in question do not contain specific language exempting a nonconforming use. However, we recognized in *H.R.D.E., Inc. v. Zoning Officer of the City of Romney,* 189 W.Va. at 286, 430 S.E.2d at 344, that "[i]n West Virginia we have statutorily recognized a nonconforming use, and we have mandated that a nonconforming use cannot be prohibited if the purpose of the use remains the same after the ordinance is enacted. *W.Va.Code,* 8–24–50 [1984]." (Footnote omitted).[11]

Both *Longwell* and W.Va.Code, 8–24–50, speak of a nonconforming use in terms of a zoning ordinance. However, we believe the broad scope of land-use regulations authorized in W.Va.Code, 8–24–1, et seq., allows a nonconforming use exemption enacted thereunder to apply to any regulation that restricts the use of land. In the present case, we deal with subdivision regulations enacted under W.Va.Code, 8–24–28, et seq.

---

graveyards, or the maintenance and operation of secondhand stores or outlets in residential areas;

"(h) To classify and designate the rural lands among agricultural, industrial, commercial, residential and other uses and purposes; and

"(i) To divide the municipality or county into districts of such kind, character, number, shape and area as may be deemed necessary to carry out the purposes of this section."

9. W.Va.Code, 8–24–28, in relevant part, states:

"After a comprehensive plan and an ordinance containing provisions for subdivision control and the approval of plats and replats have been adopted by the governing body of the municipality or by the county court [county commission] and a certified copy of the ordinance has been filed ..., a plat of a subdivision shall not be recorded by the clerk of such county court [county commission] unless it has

first been approved by the planning commission having jurisdiction over the area."

10. See note 1, *supra*, for the definition of a comprehensive plan.

11. In note 5 of *H.R.D.E.,* 189 W.Va. at 286, 430 S.E.2d at 344, we stated:

"*W.Va.Code,* 8–24–50 [1984] states, in part: " 'Such zoning ordinance or ordinances shall not prohibit the continuance of the use of any land, building or structure for the purpose for which such land, building or structure is used at the time such ordinance or ordinances take effect, but any alteration or addition to any land or any alteration, addition or replacement of or to any existing building or structure for the purpose of carrying on any use prohibited under the zoning rules and regulations applicable to the district may be prohibited[.]' "

In this case, the controversy is not over the mobile home lots that existed in 1975, when the Regulations were adopted.[12] Likewise, the Commission has not sought to enforce the Regulations against the mobile homes placed on the property before it warned the plaintiff in October of 1991 that any additional mobile homes must ·comply with the Regulations. The issue, therefore, focuses on the extent to which a landowner may expand a nonconforming use.

█ The general rule with regard to extending a nonconforming use to additional property is reiterated in 83 Am.Jur.2d *Zoning & Planning* § 670 at 572 (1992):

"A nonconforming use is generally restricted to the area that was nonconforming at the time the restrictive ordinance was enacted. Where the use of property involves a physical extension of a nonconforming use to a part of the land not used for the prohibited purpose prior to the enactment of the restrictive ordinance, the extension is frequently deemed to violate an ordinance which in general language prohibits the extension of nonconforming uses." (Footnotes omitted).[13]

*See also Patchak v. Lansing Township,* 361 Mich. 489, 105 N.W.2d 406 (1960); *State ex rel. Howard v. Village of Roseville,* 244 Minn. 343, 70 N.W.2d 404 (1955); *Lower Mount Bethel Township v. Stabler Dev. Co.,* 97 Pa. Commw. 195, 509 A.2d 1332 (1986), *appeal denied,* 516 Pa. 620, 531 A.2d 1121 (1987). We recognized much this same principle in *Longwell v. Hodge,* 171 W.Va. at 48, 297 S.E.2d at 823:

"A 'grandfather' exception alleviates the initial hardship to the owner of nonconforming property of immediate compliance with a new ordinance. A 'grandfather' clause, however, is not designed to create a continuing, protected, non-conforming use within the zoned area, running with the land and inuring indefinitely to the benefit of the owner."

In *Stop & Shop v. Board of Zoning Appeals,* 184 W.Va. 168, 399 S.E.2d 879 (1990), after quoting the foregoing language from *Longwell,* we held that the Stop & Shop Market could not, under the theory of a nonconforming use, expand its parking onto an adjacent residential lot which it owned.

Accordingly, we conclude that a nonconforming use allows the owner of property to avoid conforming to a land-use regulation that affects his property. However, the nonconforming use is limited to the use existing at the time the regulation was adopted and it ordinarily may not be expanded into other areas of the property where the nonconforming use did not previously exist.

This same general principle has been applied to the proposed expansion of a nonconforming mobile home park. Other courts have repeatedly held that an owner's right to a nonconforming use extends only to those mobile home lots in existence or under construction at the time the land use regulation was implemented and does not include sites that are merely planned. *Blundell v. City of West Helena,* 258 Ark. 123, 522 S.W.2d 661 (1975); *Langford v. Calcasieu Parish Police Jury,* 396 So.2d 956 (La.App.1981); *Patchak v. Township of Lansing, supra; Town of Amherst v. Cadorette,* 113 N.H. 13, 300 A.2d 327 (1973); *In Re Tadlock's Appeal,* 261 N.C. 120, 134 S.E.2d 177 (1964); *Overstreet v. Zoning Hearing Bd.,* 49 Pa.Commw. 397, 412 A.2d 169 (1980). *See generally* 2 R. Anderson, *American Law of Zoning* § 14.14 (3d ed. 1986 & Supp.1992).

Although the plaintiff recognizes that the majority of jurisdictions do not favor the enlargement of a nonconforming use, he urges us to adopt the "natural expansion doctrine," which permits the nonconforming user to increase its volume of business. *See,*

---

12. We have used the terms "Regulation" and "Ordinance" interchangeably throughout the opinion. The Subdivision Regulations were, in fact, adopted by an ordinance of the Berkeley County Court [Commission] on June 26, 1975.

13. The ordinance in question did not provide any specific language that a nonconforming use could not be expanded. Even in the absence of such specific language, courts have held that a nonconforming use may not be expanded as this would offend the purpose of the land-use regulation. *See, e.g., Hyatt v. Zoning Bd. of Appeals,* 163 Conn. 379, 311 A.2d 77 (1972); *Norton Shores v. Carr,* 81 Mich.App. 715, 265 N.W.2d 802 (1978). *See generally* 83 Am.Jur.2d *Zoning & Planning* at § 660.

*e.g., Rotter v. Coconino Cty.,* 169 Ariz. 269, 818 P.2d 704 (1991); *Gilbertie v. Zoning Bd. of Appeals,* 23 Conn.App. 444, 581 A.2d 746 (1990); *Chartiers v. William H. Martin, Inc.,* 518 Pa. 181, 542 A.2d 985 (1988). As explained in 83 Am.Jur.2d *Zoning & Planning* § 661 at 562–63, the "natural expansion doctrine" recognizes the property owner's right

> "to expand a nonconforming business use to meet the demands of normal growth.... However, it has been held to be subject to limitation where (1) the expansion is inconsistent with the public interest, (2) the proposed expansion is in actuality not an expansion of the old use but the addition of a new use, or (3) the imposition of limitations is necessary to prevent excessive expansion." (Footnotes omitted).

We have reviewed the cases cited by the plaintiff and the vast majority of them discuss the natural expansion doctrine in terms of accommodating an expansion of a building or existing parking area because of an increase in the volume of business conducted on the same parcel of land. The majority of these cases do not address situations where the landowner desires to expand his business onto property where the business did not previously exist.[14]

### IV.

■ The plaintiff further argues that the Commission should be estopped from enforcing the Regulations against him because he relied on the representations of Ms. DeCamp that all preexisting mobile home parks would not be subject to their provisions. The plaintiff refers to Ms. DeCamp's letter of December 12, 1980, but, as we pointed out in the factual recitations, this letter discussed only the Stolipher Mobile Home Park and not Rocky Glen. Moreover, his reliance on Ms. DeCamp's memorandum[15] cannot be construed to authorize an indefinite expansion of an original nonconforming use.

■ Even if it could be so construed, the Commission, as a governmental entity, is subject to the doctrine of estoppel only when equity clearly requires that it be done. We explained this principle in Syllabus Point 7 of *Samsell v. State Line Development Co.,* 154 W.Va. 48, 174 S.E.2d 318 (1970):

> "The doctrine of estoppel should be applied cautiously, only when equity clearly requires that it be done, and this principle is applied with especial force when one undertakes to assert the doctrine of estoppel against the state."

Moreover, "a municipality acting in a governmental, rather than a proprietary, capacity is not subject to the law of equitable estoppel and ... therefore, estoppel cannot be based on unauthorized acts of municipal authorities acting in a governmental capacity." *Martin v. Pugh,* 175 W.Va. 495, 503, 334 S.E.2d 633, 641 (1985). In *Shaffer v. Monongalia General Hospital,* 135 W.Va. 163, 169–70, 62 S.E.2d 795, 798 (1950), we stated:

> "The basic test in determining whether a public corporation, in its operations, is engaged in a discharge of a governmental function or is acting in a proprietary capacity is whether the act performed is for the common benefit of the public or is for the special benefit or profit of the corporation." (Citation omitted).

The enforcement of the Regulations by the Commission and its agents is for the common benefit of the public generally and not for the private gain of the governmental entity. Thus, when Ms. DeCamp determined whether the plaintiff's mobile home park was exempt from the Regulations, she was performing a governmental function.

The reason estoppel is not invoked when a municipality is acting in a governmental capacity was explained in *Cawley v. Board of Trustees,* 138 W.Va. 571, 584, 76 S.E.2d 683, 690 (1953): "To permit such estoppel on the basis of mistake or ill advised action would hinder and hamper governmental functions; and may be contrary to the public interest in many cases." Thus, even if we thought that Ms. DeCamp had misinformed the plaintiff in her December 12, 1980, correspondence, we

---

**14.** Although the plaintiff asserts that he has spent funds on the proposed expansion at Rocky Glen, there is nothing in the record to support this claim. Moreover, we are reluctant to apply the holding in *H.R.D.E. v. Zoning Officer of the City* *of Romney, supra,* to the expansion of a nonconforming use.

**15.** See note 3, *supra,* for the pertinent text of Ms. DeCamp's memorandum.

would not apply the doctrine of estoppel and find the planned expansion exempt from the Regulations. Therefore, we hold that the Commission is not estopped from enforcing the Regulations against all proposed growth in mobile home parks that preexisted the enactment of the Regulations.[16]

## V.

▮▮▮▮ Finally, the plaintiff argues that if he is forbidden to expand Rocky Glen, the Commission, in effect, is taking his property without just compensation in violation of the Fifth Amendment to the United States Constitution[17] and Section 9 of Article III of the West Virginia Constitution.[18] The United States Supreme Court in *Lucas v. South Carolina Coastal Council,* —— U.S. ——, ——, 112 S.Ct. 2886, 2894, 120 L.Ed.2d 798, 813 (1992), reiterated what the Court had previously said on numerous occasions: "[T]he Fifth Amendment is violated when land-use regulation 'does not substantially advance legitimate state interests or *denies an owner economically viable use of his land.*" Quoting *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106, 112 (1980). (Citations omitted; emphasis in *Lucas*). In other words, "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered ·a taking." —— U.S. at ——, 112 S.Ct. at 2895, 120 L.Ed.2d at 814. (Footnote omitted; emphasis in original). In *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 125, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, 649 (1978), the Court gave this summary of a regulation that does not offend the Fifth Amendment's prohibition against the taking of property:

"More importantly for the present case, in instances in which a state tribunal reasonably concluded that 'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land, this Court has upheld land-use regulations that destroyed or adversely affected recognized real property interests." (Citations omitted).

In *G–M Realty, Inc. v. City of Wheeling,* 146 W.Va. 360, 120 S.E.2d 249 (1961), we addressed a constitutional attack on an ordinance that prohibited the operation of a gasoline service station in a Commercial A zone, but allowed them in a Commercial B zone. We stated in Syllabus Point 1:

"A zoning ordinance of a municipality prohibiting a gasoline service station within a definite zone or area of a municipality, though other types of businesses are permitted therein, is not invalid as constituting an unwarranted classification, or as violating constitutional provisions relating to due process, since the nature of the operation of such a station inherently involves potential dangers to the health, safety, morals and general welfare of the people."

*See also Par Mar v. City of Parkersburg,* 183 W.Va. 706, 398 S.E.2d 532 (1990); *DeCoals, Inc. v. Board of Zoning Appeals,* 168 W.Va. 339, 284 S.E.2d 856 (1981).

Thus, land-use regulations will not constitute an impermissible taking of property under the Fifth Amendment to the United States Constitution and Section 9 of Article III of the West Virginia Constitution if such regulations can be reasonably found to promote the health, safety, morals, or general welfare of the public and the regulations do not destroy all economic use of the property. Under the foregoing law, we find that the

**16.** Likewise, we find the plaintiff's argument that the Commission should be prohibited by the doctrine of laches from enforcing the Regulations against all new growth at Rocky Glen is also without merit. Stated succinctly, " '[l]aches is delay which operates prejudicially to another person's rights.'" *Maynard v. Board of Educ.,* 178 W.Va. 53, 59, 357 S.E.2d 246, 253 (1987), · quoting Syllabus Point 1, in part, *Bank of Marlinton v. McLaughlin,* 121 W.Va. 41, 1 S.E.2d 251 (1938). Here, the Commission immediately notified the plaintiff of its decision that in future cases involving preexisting mobile home parks, a determination would be made on a case-by-case

basis; thus, the Commission's actions do not constitute laches.

**17.** The applicable portion of the Fifth Amendment to the United States Constitution states: "[N]or shall private property be taken for public .use, without just compensation."

**18.** The applicable provision of Section 9 of Article III of the West Virginia Constitution states: "Private property shall not be taken or damaged for public use, without just compensation; ... such compensation shall be ascertained by an impartial jury of twelve freeholders."

Regulations herein are a reasonable exercise of police power and conclude they do not violate the Fifth Amendment to the United States Constitution or Section 9 of Article III of the West Virginia Constitution. In this case, the Regulations do not deny the plaintiff all economic use of his land. Indeed, the plaintiff may expand the mobile home park on his property so long as he complies with the Regulations.[19]

## VI.

Accordingly, in light of the foregoing, we affirm the final order of the Circuit Court of Berkeley County.

Affirmed.

---

**19.** We also find no merit in the plaintiff's contention that the Commission's denial of his request for an exemption violates the *ex post facto* clauses of the West Virginia and the United States Constitutions. As we explained in *Shumate v. Department of Motor Vehicles*, 182 W.Va. 810, 814 n. 4, 392 S.E.2d 701, 705 n. 4 (1990): "It is fundamental that *ex post facto* principles do not apply to civil proceedings, but only criminal proceedings." (Citations omitted). *See, e.g., Collins v. Youngblood*, 497 U.S. 37, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). *See generally* 16 Am.Jur.2d *Constitutional Law* § 635 (1984).

We also find meritless the plaintiff's argument that the Commission committed an *ultra vires* act by issuing the directive, dated September 12, 1989. He alleges it reflected a substantial change in policy. We believe that the directive was merely the Commission's final interpretation of how preexisting mobile home parks should be treated under the Regulations and not an amendment to the Regulations.